**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DR. MICHAEL KATZ, M.D., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 22-625-WCB |
| BEEBE HEALTHCARE, | § | |
| BEEBE MEDICAL GROUP, | § | |
| MARY FRANCES SUTER, individually, | § | |
| DR. BOBBY GULAB, individually, | § | |
| DR. JEFFREY HAWTOF, individually, | § | |
| LYNNE VOSKAMP, individually, | § | |
| DR. DAVID TAM, individually, | § | |
| RICK SCHAFFNER, individually | § | |
| | § | |
| *Defendants*. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This plaintiff in this case, Dr. Michael Katz, M.D., has filed claims of employment discrimination against two related medical institutions and six individuals who worked at those institutions. The defendants have filed a motion for summary judgment. Dkt. Nos. 89, 90. Dr. Katz has responded, Dkt. No. 91, and the defendants have filed a reply, Dkt. No. 92. An oral argument on the motion was held on March 25, 2025. The defendants' motion is granted in part and denied in part pending a further submission by the plaintiff.

## I.    BACKGROUND

Defendant Beebe Medical Center d/b/a Beebe Healthcare ("Beebe Healthcare"), one of the two corporate defendants, is an umbrella organization that offers a variety of medical services in Sussex County, Delaware, including operating a hospital named the Margaret H. Rollins Lewes Campus, which is commonly referred to as the Beebe Medical Center. *See* Dkt. No. 90-2, Exh. 2

1

at 14:21–15:18; *id.*, Exh. 5 at 1.[1]  The service lines offered at the hospital include cardiac and vascular, surgical services, oncology, women's health, and orthopedic services.  Dkt. No. 90-3, Exh. 5 at 1.

The Beebe Physician Network, Inc. d/b/a Beebe Medical Group ("Beebe Medical Group"), which is the other corporate defendant in this case, is a subsidiary of Beebe Healthcare.  It employs all the physicians who work at the Beebe Medical Center.  Dkt. No. 90-2, Exh. 3 at 25:24–26:8; *id.*, Exh. 4 at 27:11–18.

Dr. Bobby Gulab, one of the individual defendants, served as the Chief Medical Officer and Senior Vice President of the Beebe Medical Group during the period at issue in this case.  Dkt. No. 90-2, Exh. 3 at 23:15–18; *id.*, Exh. 4 at 15:23–16:5, 16:23–17:3, 17:24–18:7.  He reported directly to Dr. David Tam, another of the individual defendants.  Dkt. No. 90-2, Exh. 4 at 25:8–9.  Dr. Tam was the President and Chief Executive Officer of Beebe Healthcare.  *Id.* at 22:21–23:4.  Dr. Abraham Scheer, a neurologist, served as the Medical Director of the stroke program at the Beebe Medical Center.   Dkt. No. 90-2, Exh. 2 at 22:1–3.  In that role, he supervised the other neurologists who worked in the stroke program, and he also had administrative responsibilities for the program.  *Id.* at 26:17–28:11; Dkt. No. 90-2, Exh. 4 at 29:18–30:5.  Within the medical staff, Dr. Scheer reported to Dr. Jeffrey Hawtof, the Vice President and Chief of Medical Operations for Beebe Healthcare.  Dkt. No. 90-2, Exh. 4 at 32:11–33:6; Dkt No. 90-8, Exh. 30 at 8:21–22, 11:3–24.  Dr. Katz, who worked part-time as a neurologist at the hospital, reported to Dr. Scheer.  Dkt. No. 90-2, Exh. 4 at 29:18–22.

---

[1]  To avoid confusion between the Beebe Medical Center organization, which is known as Beebe Healthcare, and the hospital, which is also referred to as the Beebe Medical Center, this opinion will refer to the umbrella organization as Beebe Healthcare, the subsidiary group of physicians as the Beebe Medical Group, and the hospital as the Beebe Medical Center or the Beebe hospital.

The other individual defendants, Rick Schaffner, Dr. Hawtof, Lynne Voskamp, and Mary Frances Suter,[2] were all employed by Beebe Healthcare during the relevant period and were in a separate chain of command. Mr. Schaffner was the Executive Vice President and Chief Operating Officer of Beebe Healthcare; he reported to Dr. Tam. Dkt. No. 90-2, Exh. 2 at 9:16–22; Dkt. No. 90-4, Exh. 12 at 8:10–15. In 2020, Dr. Hawtof initially reported to Mr. Schaffner, but began reporting directly to Dr. Tam at some point during that year. Dkt. No. 90-2, Exh. 3 at 24:10–25:17. Dr. Hawtof also served as a physician, and in that capacity he reported to Dr. Gulab. Dkt. No. 90-4, Exh. 11 at 23:20–21. Ms. Voskamp, a nurse-practitioner, was the Vice President of Patient Care and Chief Nursing Officer for Beebe Healthcare. Dkt. No. 90-2, Exh. 3 at 22:9–24; Dkt. No. 90-4, Exh. 13 at 10:11–11:3. She reported to Mr. Schaffner. Dkt. No. 90-4, Exh. 13 at 23:6–8. And Ms. Suter, also a nurse-practitioner, was the Executive Director of Cardiovascular Services for Beebe Healthcare. *Id.*, Exh. 2 at 13:5–24; Dkt. No. 90-4, Exh. 14 at 14:21–15:1, 24:13–24. She reported to Ms. Voskamp. Dkt. No. 90-2, Exh. 2 at 13:25–14:1. In that role, Ms. Suter had administrative responsibility for the stroke program at the hospital, although she was not in the supervisory chain of command over the physicians in that program. *Id.* at 13:5–24. She characterized her role as a "co-collaborator on the quality . . . oversight of stroke" with Dr. Scheer, in his role as Medical Director of the stroke program. Dkt. No. 90-6, Exh. 16 at 10–12.

In 2009, Beebe Healthcare started a neurohospitalist program at the Beebe Medical Center to provide inpatient neurological coverage and stroke response at the hospital.[3] Dkt. No. 90-3,

---

[2] Mary Frances Suter, sometimes referred to as Dr. Suter, had a Ph.D. in nursing. Dkt. No. 90-4, Exh. 14 at 11:6–12, 16:16–17. Lynne Voskamp, the Chief Nursing Officer for Beebe Healthcare, also had a Ph.D. Dkt. No. 90-1, Exh. 1 at 46:18–23. For clarity, however, this opinion will use the term "Dr." only with reference to physicians.

[3] A neurohospitalist is a neurologist who works exclusively in a hospital, providing emergency and inpatient care. A community neurologist in private practice, by contrast, treats outpatients but may have hospital privileges allowing the physician to offer inpatient treatment as

Exh. 5 at ¶ 4. The program was designed to ensure that a neurologist would be available either in the hospital or on call 24 hours a day, 365 days a year. Dkt. No. 90-6, Exh. 16 at 26:4–8. To staff the program, the Beebe Medical Group contracted with three neurologists who shared the task of providing full-time coverage, either in the hospital or on an on-call basis.

In 2019, two of the three neurohospitalists then serving in the stroke program stopped taking calls at the hospital. Dkt. No. 90-3, Exh. 5 at ¶¶ 6–7. That left only Dr. Scheer to cover the neurohospitalist shifts. Dkt. No. 90-1, Exh. 1 at 27:6–23; Dkt. No. 90-2, Exh. 2 at 87:5–13; *id.*, Exh. 4 at 59:14–60; Dkt. No. 90-4, Exh. 14 at 67:23–68:6.

The hospital found it difficult to recruit replacement neurohospitalists. Dkt. No. 90-2, Exh. 3 at 74:2–11; *id.*, Exh. 4 at 57:12–18, 58:1–59:13; Dkt. No. 90-4, Exh. 14 at 68:12–15. Ultimately, however, the Beebe Medical Group contracted with Dr. Katz and another physician, Dr. Raid Kofahi, to serve in that capacity. Dkt. No. 90-2, Exh. 2 at 31:17–32:1; Dkt. No. 90-7, Exh. 17 at 103:3–8. Dr. Katz, who maintained a private practice in Hackensack, New Jersey, agreed to work part-time at the Beebe Medical Center, taking six 24-hour shifts each month, with each shift consisting of 12 hours at the hospital and 12 hours on call. Dkt. No. 90-3, Exh. 10 at 62:6–64:23; Dkt. No. 90-4, Exh. 12 at 38:2–6. At the time he began working at the Beebe Medical Center, Dr. Katz was 60 years old. Dkt. No. 90-3, Exh. 10 at 16:12–13. The summary judgment record does not reflect how old Dr. Kofahi was at that time.

The effort to maintain full-time coverage at the hospital with Dr. Scheer, Dr. Katz, and Dr. Kofahi proved unworkable, particularly after the COVID 19 pandemic struck in early 2020. Dr. Kofahi, who lived in Jordan and traveled to Delaware to work for periods of 14 days every other

---

well. Dkt. No. 90-1, Exh. 1 at 84:10–85:3; Dkt. No. 90-2, Exh. 2 at 23:8–25, 24:24–25:3. In addition to the neurohospitalists and community neurologists in private practice, the Beebe Medical Group employed some community neurologists who provided outpatient services to the community. Dkt. No. 90-1, Exh. 1 at 85:11–87:1.

month, was unable to travel to the United States because of pandemic-related travel restrictions. Dkt. No. 90-2, Exh. 4 at 97:23–98:3; Dkt. No. 90-4, Exh. 14 at 97:11–18; Dkt. No. 90-5, Exh. 15 at 113:6–18, 114:5–22; Dkt. No. 90-7, Exh. 17 at 103:18–19, 104:5–9, 105:3–14. And because of his age (63) and his medical condition (psoriatic arthritis), Dr. Scheer informed the hospital that he had been advised to remain at home during the pandemic due to the health risks associated with contracting COVID-19. Dkt. No. 90-7, Exh. 17 at 16:23–24.

In late April 2020, in part in response to requests from the neurohospitalists, the Beebe hospital implemented a COVID-19 Emergency Telemedicine Policy and Procedure for various specialty care areas, including neurology. Dkt. No. 90-7, Exh. 26; Dkt. No. 90-9, Exhs. 33 & 36. In view of his reservations about working regularly at the hospital during the pandemic, given the risk of contracting COVID-19, Dr. Katz was provided with the equipment needed to enable him to work remotely under Beebe's telemedicine program. Dkt. No. 90-3, Exh. 10 at 106:20–23; Dkt. No. 90-9, Exhs. 32 & 33. Beebe's telemedicine program however, relied on relatively unsophisticated technology, in which a hospital employee would hold an iPad or a smartphone using Zoom near a patient so that a neurologist could observe the patient and assess the patient's condition from a remote location. Dkt. No. 90-3, Exh. 10 at 113:6–25; Dkt. No. 90-4, Exh. 14 at 112:14–114:2.

In May 2020, Dr. Scheer advised Beebe that he had taken ill and did not indicate when he expected to return to work. Because of Dr. Kofahi's difficulties traveling from his home in Jordan during the pandemic, it quickly became evident that there would be extensive gaps in stroke coverage at the hospital. In fact, there were several stretches of time between May and July in which there was no stroke coverage at all by the neurohospitalists at the hospital. Dkt. No. 90-7,

Exh. 24; Dkt. No. 90-8, Exh. 30 at 184:18–189:11, 191:15–20, 192:17–193:2; Dkt. No. 90-9, Exh. 34.

The coverage crisis in the spring and summer of 2020 brought to a head the long-term concerns that the Beebe management group had regarding Beebe's resources for treating stroke. *See* Dkt. No. 90-2, Exh. 2 at 53:12–56:11, 60:2–13, 87:5–13; Dkt. No. 90-5, Exh. 15 at 111:23–115:6; Dkt. No. 90-6, Exh. 16 at 124:2–8; Dkt. No. 90-10, Exhs. 34 & 41. Shortly after he began his service as CEO of Beebe Healthcare in the March of 2020, Dr. Tam conducted an assessment of Beebe's neurological and stroke services, both within the hospital and in the other Beebe facilities in the community. Dkt. No. 90-1, Exh. 1 at 20:13–23:9; Dkt. No. 90-2, Exh. 3 at 63:2–64:6; Dkt. No. 90-3, Exh. 5 at ¶ 9. He noted that in light of the growing number of older residents in the geographical area served by Beebe Healthcare, an increasing number of patients were experiencing neurological problems, including strokes. Dkt. No. 90-3, Exh. 5 at ¶9. As a result, he and other members of the management group at Beebe Healthcare concluded that the neurohospitalist program at the Beebe hospital was not adequate to serve the needs of the community, and that Beebe's approach to that field of treatment needed to be altered. Dkt. No. 90-1, Exh. 1 at 23:6–14; Dkt. No. 90-3, Exh. 3 at 58:22–59:17, 74:23–75:8; *id.*, Exh. 5 at ¶ 10.

Dr. Tam explained his assessment as follows:

> [W]hen I got here and started assessing the program, the neurohospitalists were providing some level of care to patients that were admitted to the hospital, but it was inconsistent because of their time, either in the hospital or being on call and then having to come into the hospital.
> At the same time, I also recognized that we had no community neurologists, people that provided services to patients in the outpatient setting to provide care for things like post-stroke or seizures or developmental delay, migraines, Parkinson's disease, multiple sclerosis. And so it was clear to me that we needed to look at how to better provide neurologic care to the entire spectrum of patients in Sussex County.

Dkt. No. 90-2, Exh. 3 at 58:22–59:17.  He added that in light of the growth of the community in Sussex County, it became clear that "we were not able to meet all the needs of the inpatient neurologic care to support hospitalists and emergency room physicians" and  that "we also did not have enough community-level neurologists working outside the hospital to take care of patients in an ambulatory setting."  *Id.* at 63:8–22; *see also* Dkt. No. 90-5, Exh. 15 at 196:20–197:20.

In early June 2020, Beebe discontinued its COVID-19 telemedicine program because it decided the employees who had been responsible for running the program needed to return to their normal roles and that it would not be practicable to continue the Emergency Telemedicine program with Beebe's equipment.  Dkt. No. 90-6, Exh. 16 at 113:21–114:8; Dkt. No. 90-8, Exh. 30 at 114:14–115:10; Dkt. No. 90-9, Exh. 38.  Following the termination of that program, the hospital had difficulty providing neurohospitalist coverage, as Dr. Scheer was unavailable to provide in-person coverage for his shifts, and Dr. Kofahi remained unable to travel to the United States.  Dkt. No. 90-3, Exh. 10 at 223:2–4; Dkt. No. 90-4, Exh. 14 at 126:5–17.  In July, Dr. Katz provided no coverage, and the neurohospitalist program was without coverage for most of the month.  Dkt. No. 90-3, Exh. 10 at 75:25–76:4; Dkt. No. 90-7, Exhs. 23 & 24.  In light of the difficulties Beebe continued to experience in providing full-time neurologist coverage for the hospital, Beebe's management group ultimately decided to terminate the neurohospitalist program.

During that period, Beebe began exploring the possibility of expanding its relationship with the Thomas Jefferson University Hospital in Philadelphia ("Jefferson"), with which Beebe had already had a partnership arrangement involving stroke treatment since 2016.  Dkt. No. 90-2, Exh. 2 at 58:8–16; Dkt. No. 90-8, Exhs. 27, 28, & 29; Dkt. No. 90-9, Exh. 37.  In July 2020, Beebe entered into agreements with Jefferson to enable Beebe to provide general teleneurology (non-stroke) consultation services and to provide stroke care at the Beebe Medical Center by locating

the Jefferson Hospital's Jefferson Expert Teleconsulting ("JET") equipment at the Beebe Medical Center and facilitating remote assessment and treatment of stroke victims by physicians located at the Jefferson Hospital.  Dkt. No. 92, Exh. 2 at 53:12–54:2, 55:5–10.  The Jefferson teleneurology program, which used far more sophisticated technology than Beebe had used in its Emergency Telemedicine program, made it possible to provide full-time, on-demand neurological care in the inpatient setting, with rapid response times, an important issue in the treatment of strokes.  Dkt. No. 90-1, Exh. 1 at 152:17–153:19; Dkt. No. 90-2, Exh. 2 at 56:17–57:1; *id.*, Exh. 3 at 94:19–95:21, 96:14–21, 97:22–98:16, 102:5–14; *id.*, Exh. 4 at 95:18–96:6; Dkt. No. 90-6, Exh. 16 at 79:20–80:20.

During the summer of 2020, Dr. Tam and the management group at Beebe Healthcare decided to terminate the neurohospitalist program at the hospital in favor of relying on a combination of the Jefferson teleneurology service and community neurologists in the Beebe service area who could treat outpatients but would also be available to treat inpatients at the hospital as needed.  Dkt. No. 90-1, Exh. 1 at 127:18–19; Dkt. No. 90-2, Exh. 3 at 106:6–12.  By the fall of that year, Beebe was relying mainly on Jefferson for stroke coverage at the Beebe Medical Center.  Dkt. No. 90-1, Exh. 1 at 121:3–21.

Following the decision to terminate the neurohospitalist program, Beebe gave notice to the three physicians who had been working in that program—Dr. Scheer, Dr. Kofahi, and Dr. Katz—that it would be terminating their contracts as neurohospitalists in accordance with the notice provisions in the contracts.  Dkt. No. 90-2, Exh. 4 at 75:16–76:7, 85:2–6.  As a result, Dr. Katz was told on September 1, 2020, that he would be paid through November 30, 2020, but would not be expected to work during that three-month period.  Dkt. No. 90-10, Exh. 46.

8

Dr. Kofahi inquired about continuing to work for Beebe in a new capacity under the new regime. In October 2020, he was hired to serve as Medical Director of Neurology and Stroke Services, with the expectation that he would establish an office in the community and serve as a community neurologist working for Beebe Healthcare. *See* Dkt. No. 91-6, Exh. F. However, Dr. Kofahi was unable to establish a neurology practice in the community, and his tenure in his new position ended in June 2021. *See* Dkt. No. 91-7, Exh. G. Dr. Katz did not inquire about returning to work for Beebe in any capacity after his tenure as a neurohospitalist ended in the fall of 2000. Dkt. No. 90-3, Exh. 10 at 144:16–21, 145:21–146:1, 147:21–146:1.

Following his termination, Dr. Katz filed this action, claiming that he had suffered employment discrimination under the Age Discrimination in Employment Act ("ADEA"), the Delaware Discrimination in Employment Act ("DDEA"), and the Americans with Disabilities Act ("ADA"). Dkt. Nos. 1 (complaint) and 20 (first amended complaint). Dr. Scheer filed a separate but similar action of his own based on the ADEA, the ADA, and the DDEA. *Scheer v. Beebe Healthcare et al.*, No. 21-1565 (D. Del. Nov. 2, 2021). In addition, Dr. Scheer included a claim under the Family Medical Leave Act. Dr. Scheer's action is still pending in the District of Delaware.

On the defendants' motion, Dr. Katz's claim under the ADA was dismissed for failure to exhaust administrative remedies. Dkt. No. 29. Following discovery, the defendants filed the present motion for summary judgment. Dkt. No. 89.

## II.    DISCUSSION

### A.  The Individual Defendants

The defendants first move to dismiss the ADEA and DDEA claims against all the individual defendants, on the ground that neither statute gives rise to liability on the part of individual persons.

The ADEA by its terms extends liability only to an "employer."[4]  *See* 29 U.S.C. § 623(a). It is well settled in the Third Circuit (and in every other circuit that has addressed the issue) that the agents of employers, such as the individual defendants in this case, are not "employers" under the ADEA and are thus not subject to suit in their individual capacities.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 246 n.29 (3d Cir. 2006); *see also Fantini v. Salem State College*, 557 F.3d 22, 29–30 (1st Cir. 2009); *Guerra v. Jones*, 421 F. App'x 15, 17 (2d Cir. 2011); *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37,* 260 F.3d 602, 610 n.2 (7th Cir. 2001); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404 (6th Cir. 1997); *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996); *Lenhardt v. Basic Inst. of Tech., Inc.*, 55 F.3d 377, 381 (8th Cir. 1995); *Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510–11 (4th Cir. 1994); *Lankford v. City of Hobart*, 27 F.3d 477, 480 (10th Cir. 1994); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).  The Delaware Supreme Court has likewise held that a claim against an individual defendant is barred under the DDEA because that statute, like the federal ADEA, "does not contemplate liability against individual employees."  *Cannon v. New*

---

[4]  The DDEA also limits liability to an "employer."  *See* 19 Del. C. § 711(b).  On this issue, as on all other pertinent issues involving the federal ADEA, the parties agreed at the hearing on the summary judgment motion that the construction of the Delaware Age Discrimination Act is identical to that of the federal statute.  For that reason, I will refer solely to the ADEA in this opinion even when discussing legal issues arising under both statutes.

*Journal*, No. 214, 2008, 2008 WL 4918215, at *1 n.11 (Del. Nov. 18, 2008); *see also Sapienza v. Castellon*, No. 14-974, 2016 WL 1212132, at *5 (D. Del. Mar. 28, 2016).

Dr. Katz does not challenge the legal correctness of the proposition that ADEA actions cannot be brought against individuals in their individual capacities. Instead, he argues that the defendants waived their opportunity to seek dismissal of the complaint on that ground by not raising that issue in their initial pleading as an affirmative defense or moving to dismiss thee claims against the individual defendants at the outset of the case. *See* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . .").

Specifically, Dr. Katz argues that "the absence of individual liability is a defense which seeks to avoid liability by alleging a legal ground which negates liability" and is thus an "affirmative defense." Dkt. No. 91 at 5. A defense negating the plaintiff's *prima facie* case, however, is not an affirmative defense. *Elliott v. Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 321 (3d Cir. 2006); *see also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1270 (4th ed. 2024) (distinguishing affirmative defenses from "negative defenses that directly contradict elements of the plaintiff's claim for relief"); *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense."). The argument that the plaintiff did not establish an element of its claim may be raised at any time up to, and including, at trial. *See* Fed. R. Civ. P. 12(h)(2).

The requirement that a defendant have the status of an "employer" is not an affirmative defense, but an element of the cause of action under the ADEA on which the plaintiff bears the burden of proof. One aspect of an ADEA plaintiff's *prima facie* case is that the defendant has the status of an "employer" as that term is defined in 29 U.S.C. § 630(b), which requires that the

11

employer must have 20 or more employees to be covered by the ADEA. Courts have uniformly held that requirement to be an element of the plaintiff's claim. *See Pastore v. Callister Law, PLLC*, No. 2:20-cv-1959, 2022 WL 1558481, at *1 (D. Nev. May 16, 2022); *Grimsley v. Methodist Richardson Med. Ctr. Found., Inc.*, No. 3:09-CV-2011, 2011 WL 825749, at *2 (N.D. Tex. Mar. 3, 2011); *Santichen v. Greater Johnstown Water Auth.*, No. 06-72J, 2008 WL 868212, at *9 (W.D. Pa. Mar. 31, 2008); *Stults v. Advance Alabama/Check, L.L.C.*, No. CV-05-S-59, 2006 WL 8436962, at *2 (N.D. Ala. Sept. 29, 2006). The same principle applies for closely analogous statutes such as Title VII of the Civil Rights Act of 1964. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006) ("[T]he threshold number of employees for Title VII is an element of the plaintiff's claim for relief . . . .)"; *Nesbit v. Gears Unlimited, Inc.,* 347 F.3d 72 (3d Cir. 2003) ("[T]he fifteen-employee threshold is a substantive element (whether an 'employer' exists) of a Title VII claim . . . ."); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006); *Faulkner v. Woods Transp., Inc.*, 174 F. App'x 525, 528 (11th Cir. 2006).[5] As in those cases, the issue whether the individual defendants were employers was an element of the ADEA claim, not an affirmative defense that the defendants had to raise at the outset of the case.[6]

---

[5] At the hearing on the defendants' summary judgment motion, Dr. Katz's counsel cited the Supreme Court's decision in *Arbaugh* as supportive of her position that the inapplicability of the ADEA to individual defendants is an affirmative defense. That is a misreading of the case. *Arbaugh* held that the analogous numerosity requirement of Title VII is not a jurisdictional requirement, and thus could not be raised after judgment had been entered in the case. In the course of so ruling, the Court explained that the numerosity requirement is "an element of the plaintiff's claim." 546 U.S. at 516. The plain meaning of that statement is that the numerosity requirement is not an affirmative defense. The issue is thus not waived as a result of not being raised in the initial pleadings in the case. All the cases cited in the text interpret *Arbaugh* for that proposition. The decision in *Wauben v. Protego*, No. 2:05-2780, 2007 WL 775614, at *3–4 (D.S.C. Mar. 9, 2007), in particular, makes clear Dr. Katz's error in reading *Arbaugh*. The plaintiff in that case (like Dr. Katz) argued that the defendant had waived the numerosity issue by not raising the issue in its answer; the district court, citing *Arbaugh*, explained why that argument misconstrued *Arbaugh*.

[6] The defendants argue that Dr. Katz is barred from contending that the individual

Even if proof of "non-employer" status were regarded as an affirmative defense on which the burden of proof lay with the individual defendants, the individual defendants' failure to plead that affirmative defense in their answer would not render the defense waived unless the failure to plead the affirmative defense resulted in prejudice to the plaintiff. *See Cetal v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006) (holding that "affirmative defenses can be raised by motion, at any time (even after trial), if plaintiffs suffer no prejudice"); *see also Sharp v. Johnson*, 669 F.3d 144, 158 (3d Cir. 2012); *Charpentier v. Godsil*, 937 F.2d 859, 863–64 (3d Cir. 1991); *Houston Cas. Co. v. Trust Fin. Corp.,* No. 1:18-cv-1472, 2021 WL 2292222, at \*7 (D. Del. June 4, 2021) (Bibas, Circuit Judge, sitting by designation). There is no suggestion in this case that the plaintiff has been prejudiced by the delay in the defendants' request to have the claims against the individual defendants dismissed. Summary judgment is therefore granted to the individual defendants on the ground that they do not qualify as "employers" under the ADEA and the DDEA.

## B. Defendant Beebe Healthcare

The defendants next contend that Beebe Healthcare was not Dr. Katz's "employer" and therefore must be dismissed from this case. The defendants point out that Dr. Katz's immediate employer was the Beebe Medical Group, as indicated in the Physician Employment Agreement

---

defendants are not subject to suit under the ADEA and the DDEA because counsel for Dr. Katz acknowledged that the request to dismiss the individual defendants did not have to be raised at the outset of the case. For support, they point to an email from Dr. Katz's counsel dated October 1, 2024, in which she refused to dismiss the individual defendants and stated that she did not "believe that this is the legally appropriate time to address the individual Defendants." Dkt. No. 92-1, Exh. 50 at 2. That argument by the defendants is not persuasive. When that email was sent, the time for pleading affirmative defenses had long since passed. And counsel's statement that it was not "the legally appropriate time to address the individual Defendants" could well be understood to mean that the "legally appropriate time" had already passed. For that reason, the 2024 email sent by Dr. Katz's counsel does not constitute a waiver of Dr. Katz's objection to the failure to raise an affirmative defense on a timely basis. My rejection of Dr. Katz's position on this issue is therefore not based on waiver, but on the ground that the status of the individual defendants as non-employers negates an element of the claim, and is thus not an affirmative defense.

between Dr. Katz and Beebe Physician Network, d/b/a Beebe Medical Group. Dr. Katz responds that Beebe Medical Group and Beebe Healthcare were "joint employers" or "integrated employers" of Dr. Katz in that they both exercised "significant control over the same employees," *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997), and were "highly integrated with respect to ownership and operations," *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987).

Beebe Medical Group is a subsidiary of Beebe Healthcare. As the defendants point out, when a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent, is the employer. *Marzano v. Comput. Sci. Corp.*, 91 F.3d 497, 513 (3d Cir. 1996). That presumption can be overcome only upon a showing that the companies' operations are "so interrelated and integrated in their activities, labor relations, and management, it is clear that . . . they may be treated as a single employer." *Radcliffe v. Ins. Co. of N. Am.*, 482 F. Supp. 759, 764 (E.D. Pa. 1980). In this case, there is evidence that the operations of Beebe Healthcare and Beebe Medical Group are significantly integrated, and that the companies are commonly owned and managed. The distinction between the two companies appears to be principally that the Beebe Medical Group hires and supervises the physicians who work at the Beebe Medical Center, while Beebe Healthcare is the umbrella company that is responsible for all the Beebe healthcare facilities, including the Beebe Medical Center hospital.

Defendant Tam, who is the CEO of Beebe Healthcare, is also the head of Beebe Medical Group. Through the chain of command, therefore, he was Dr. Katz's top-level supervisor. In addition, the employment agreement between Dr. Katz and the Beebe Medical Group was executed on Beebe Healthcare letterhead, *see* Dkt. No. 90-7, Exh. 20, and the equal opportunity policy against discrimination and retaliation that the defendants rely on in their summary judgment

motion was a policy promulgated by Beebe Healthcare and made applicable to the Beebe Medical Group, *see* Dkt. No. 90-3, Exhs. 6 through 9. Based on those facts and the close working arrangement between the two companies, there is sufficient evidence that Beebe Medical Group and Beebe Healthcare were integrated operations such that summary judgment cannot be granted to Beebe Healthcare on the ground that Beebe Healthcare does not have the status of Dr. Katz's employer as a matter of law. *See McKenzie*, 834 F.2d at 933 (holding that the integrated operations issue could not be decided at summary judgment because of factual issues raised by the evidence of common ownership and common management). The motion for summary judgment dismissing the claims against defendant Beebe Healthcare on the ground that it was not Dr. Katz's employer is therefore denied.

### C. Discrimination Based on Age

Dr. Katz contends that his employment was terminated because of his age, in violation of the ADEA and the DDEA. The defendants respond that his termination was not attributable to his age, but instead resulted from the decision by Beebe to terminate its neurohospitalist program in favor of joining the telemedicine program run by the Thomas Jefferson University Hospital. That decision, according to the defendants, had nothing to do with Dr. Katz's age, but was based on the difficulty the defendants experienced in staffing the neurohospitalist program at the Beebe Medical Center and the relative advantages of the Jefferson teleneurology program as compared to Beebe's neurohospitalist program under the circumstances.

### 1. The Admissible Evidence of Discrimination

Dr. Katz first contends that there is direct evidence of age discrimination in this case. In the wake of the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 559 U.S. 167 (2009), the Third Circuit has characterized direct evidence of age discrimination as evidence that

is "sufficient on its own to allow a fact-finder to determine that age was the but-for cause of the termination decision."  *Palmer v. Britton Indus., Inc.*, 662 F. App'x 147, 150 (3d Cir. 2016), amended, 2025 WL 611370 (Feb. 26, 2025).  As the court in *Palmer* explained, "This is a high hurdle; the evidence must demonstrate '*without inference or presumption*' that age discrimination was the but-for cause of termination."  *Id.* (quoting *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994)); *see also Mitchell v. Univ. of Pittsburgh*, No. 22-2876, 2023 WL 8506653, at * 2 (3d Cir. Dec. 12, 2013).

Dr. Katz relies principally on two evidentiary theories to support his claim that he has pointed to direct evidence of age discrimination sufficient to overcome the defendants' summary judgment motion.  First, he references the evidence, presented mainly through the deposition testimony of Dr. Katz, that certain employees at the Beebe hospital expressed negative feelings toward him because of his age and made comments suggesting that the hospital should hire younger doctors.  Most of those comments provide some support for Dr. Katz's "hostile work environment" claim, discussed below, but they do not constitute direct evidence that he was terminated because of his age.  *See Lively v. WFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 306–07 (2d Cir. 2021) ("[S]tray remarks are rarely given great weight, particularly if they were made temporally remote from the date of the [termination] decision."); *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997).  In this case, the remarks that Dr. Katz complains about were mostly made in the period between February and June, and Dr. Katz was terminated in September.

Moreover, most of the remarks were made by fellow employees, rather than by supervisors who were empowered to terminate Dr. Katz's employment.  The only person having that authority that Katz identified as having made a comment suggesting discrimination based on age was Dr. Gulab.  Dr. Katz alleged that he overheard Dr. Gulab make a statement to an assistant at the time

of Dr. Katz's onboarding about the hospital needing "new graduates" and being unable to build a program "with doctors at the end of their career who are older." No. 90-3, Exh. 10 at 179:5–180:17. That remark, made approximately six months before Dr. Katz's termination, is insufficient to constitute direct evidence of age discrimination.

The second theory that Dr. Katz relies on as direct evidence that his termination was the result of age discrimination is that there were inconsistencies in the defendants' explanation of the reasons Beebe terminated its neurohospitalist program in favor of the JET telemedicine operated by the Thomas Jefferson University Hospital. Those inconsistencies, according to Dr. Katz, indicate that the true reason for his termination (and, presumably, for Beebe's decision to terminate its neurohospitalist program) was age discrimination.

Upon close examination, there is no force to Dr. Katz's argument about the purported inconsistencies in the defendants' accounts of how they transitioned from the neurohospitalist program to the JET telemedicine program with the Jefferson University Hospital. What is clear from the evidence is the following: In 2016, Beebe established an arrangement with Jefferson in which Jefferson would prove consultation and care in cases involving acute stokes.[7] Over time, the two parties discussed expanding their relationship. When the COVID-19 pandemic struck, the need for Beebe to rely on Jefferson became more acute, because community neurologists in the Beebe geographical region refused to provide in-patient coverage at the Beebe Medical Center. Making things worse, Dr. Kofahi was unable to travel from his home in Jordan, Dr. Scheer advised Beebe that he was unable to work for an unspecified period of time, and Dr. Katz was unable to

---

[7] Even before the pandemic, Beebe encountered problems in staffing the stroke program with neurohospitalists. For example, in January 2020, after two of the neurohospitalists who had previously served in the program stopped taking shifts at the hospital, Dr. Scheer had to work 23 straight days, each constituting 12 hours at the hospital and 12 hours on call. *See* Dkt. No. 90-1, Exh. 1 at 28:19–29:7 (referring to an interrogatory answer given by Dr. Scheer in his case).

cover all the shifts for the neurohospitalist program. Beebe therefore began to rely on Jefferson for emergency neurology consultations using Beebe's own emergency telemedical system. Beebe and Jefferson also agreed to discuss the provision of routine neurology consultations as well. Ultimately, Beebe arranged with Jefferson to rely on the sophisticated JET telemedicine system in cooperation with Jefferson, and to terminate the neurohospitalist program at Beebe altogether. The testimony from various individuals about the process leading to that decision is not inconsistent with that account.

Although Dr. Katz contends that the testimony of the defendants' witnesses revealed "shifting justifications" for the termination of Drs. Katz, Scheer, and Kofahi, there was no fundamental inconsistency in those witnesses' testimony. Both Dr. Tam and Mr. Schaffner testified that by the middle of 2020, the inconsistent stroke coverage provided by the neurohospitalist program led Beebe to consider using the JET telemedicine program to support the neurohospitalist program. Dkt. No. 90-1, Exh. 1 at 45:15–24; Dkt. No. 90-2, Exh. 2 at 55:5–56:13. Initially, as several witnesses testified, the idea was for the JET program to be used to supplement the neurohospitalist program. As Dr. Tam explained, however, Beebe ultimately decided to rely on the JET program in place of the neurohospitalist program and to rely on community neurologists to supplement the JET program. Dkt. No. 90-2, Exh. 2at 212:14–22.

The testimony of those witnesses paints a consistent picture that as Beebe learned more about the JET program, the idea of relying on JET progressed from regarding it as a potential supplement to the neurohospitalist program to a replacement for that program, which it ultimately became. Moreover, it is significant that after ending the neurohospitalist program and terminating the contracts of Drs. Katz, Scheer, and Kofahi, Beebe did not subsequently reinstate the neurohospitalist program by hiring other, younger neurologists to work in that capacity. Instead,

to the extent that Beebe needed neurologists to supplement the services provided through the JET program, it decided to rely on neurologists with practices in the community. *Id.* at 63:9–64:17. The evidence regarding the transition from the use of neurohospitalists to the primary reliance on the JET program therefore does not constitute direct evidence of age discrimination sufficient to overcome the defendants' summary judgment motion.

When a plaintiff does not present direct evidence of age discrimination, the plaintiff can rely on indirect evidence to make such a showing under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009); *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001).[8] Under the *McDonnell Douglas* framework, a plaintiff's *prima facie* case of age discrimination is established if the employee can show that (1) he is at least forty years of age; (2) he suffered an adverse employment action; (3) he was qualified for the position in question; and (4) he was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. In cases in which the plaintiff is not directly replaced by a younger person, the fourth element can be satisfied if the plaintiff can prove facts which "if otherwise unexplained, are more likely than not based on consideration of impermissible factors." *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021); *see also Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015). If the plaintiff is able to establish a *prima facie* case of discrimination, the burden of production (but not the burden of proof) shifts

---

[8]  In *Gross*, the Supreme Court noted that it has not definitively decided whether the evidentiary framework of *McDonnell Douglas* used in Title VII cases is appropriate in the ADEA context, 557 U.S. at 175 n.2; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The Third Circuit, however, has continued to apply *the McDonnell Douglas* burden-shifting framework in ADEA cases. *See Smith*, 589 F.3d at 691; *Gress v. Temple Univ. Health Sys.*, 784 F. App'x 100, 104 (3d Cir. 2019); *Ulrich v. U.S. Sec'y of Veterans Affairs*, 457 F. App'x 152, 138 n.3 (3d Cir. 2012);

to the employer to produce evidence of a legitimate non-discriminatory reason for the adverse action. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc). If the defendant carries that burden of production, the plaintiff must show that age discrimination was the reason for the adverse action. *Id.*

Importantly, to prove a violation of the ADEA (except for a violation by the government, *see* 29 U.S.C. § 633a(a)), the plaintiff must show that age was the but-for cause of the adverse employment action. *Gross*, 557 U.S. at 177–78. Thus, even if Dr. Katz could show that age was a factor in his termination, he would not be able to prevail on his termination claim unless he could show that but for age discrimination, he would not have been terminated.

It is not disputed that Dr. Katz satisfied the first three requirements of the *prima facie* case for age discrimination. The fourth requirement, however, is very much in dispute based on two points. First, the evidence does not show that Dr. Katz was replaced by a younger person. And second, the defendants contend that Dr. Katz's contract was terminated not because of Dr. Katz's age, but because of the decision to terminate the neurohospitalist program at the Beebe Medical Center, which does not implicate impermissible factors.

With respect to the first point, Dr. Katz contends that after terminating all three of the neurohospitalists (Dr. Scheer, Dr. Katz, and Dr. Kofahi), Beebe subsequently rehired Dr. Kofahi. However, Dr. Kofahi was not rehired as a neurohospitalist. Instead, upon his request he was hired as a community neurologist, a position that required that he maintain a neurology practice in the community. Dr. Kofahi never established a practice in the community, however, because he was unable to commit to a schedule that would permit him to regularly schedule outpatients. For that reason, his time with Beebe in his new capacity turned out to be very brief.

Unlike Dr. Kofahi, Dr. Katz did not inquire about returning to work for Beebe as a neurologist in any capacity. Dkt. No. 90-3, Exh. 10 at 144:16–21, 145:21–146:1, 137:6–13. Because Dr. Kofahi took a different position with Beebe, it is not the case that he "replaced" Dr. Katz as a neurohospitalist. Instead, the most that can be said is that Dr. Kofahi briefly took a different position with Beebe after Beebe terminated its neurohospitalist program.

Even if Dr. Kofahi can be regarded as having replaced Dr. Katz, there is no evidence that Dr. Kofahi was substantially younger than Dr. Katz. The summary judgment record does not contain information about Dr. Kofahi's age other than statements in Dr. Scheer's affidavit that "Dr. Kofahi was younger than both Dr. Katz and myself" and that "Dr. Kofahi appeared younger than Dr. Katz and me." Dkt. No. 91-4, Exh. D at ¶¶ 41–42. The affidavit provides no factual basis for Dr. Scheer's statement about Dr. Kofahi's age, nor does it assert that Dr. Kofahi was significantly younger than Dr. Katz.

The Supreme Court has held that an inference that an employment action was based on a discriminatory criterion "cannot be drawn from the replacement of one worker with another worker insignificantly younger." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996); *see also Inmon v. Mueller Copper Tube Co.*, 757 F. App'x 376, 381 (5th Cir. 2019) ("Replacement of a worker with someone who is substantially younger may indicate a strong prima facie case."); *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1299 (11th Cir. 2015) ("[T]he proper inquiry under *McDonnell Douglas* is whether plaintiff's replacement is 'substantially younger' than plaintiff."); *Turney v. Hyundai Constr. Equip. USA Inc.*, 482 F. App'x 259, 260 (9th Cir. 2012) (evidence of age discrimination did not raise a triable issue of fact because plaintiff "has not shown he was replaced by a 'substantially younger' employee."). Because there is no evidence in the record that Dr. Kofahi was substantially younger than Dr. Katz, there is no evidence that Dr.

Katz was "replaced" by a younger person, even assuming that Dr. Kofahi "replaced" Dr. Katz when he was offered and accepted a different position with the Beebe organization.

With respect to the second point, as noted above, the defendants point to compelling evidence that the reason the Beebe organizations terminated the neurohospitalist program was because the hospital was having great difficulty maintaining 24-hour stroke coverage at the hospital and because the alternative of partnering with the Thomas Jefferson University Hospital through that organizations' JET program had substantial advantages over the neurohospitalist program. In light of the strong showing that Beebe regarded the JET program as clearly superior to maintaining the neurohospitalist program, there is no basis for concluding that Beebe's adoption of the JET program for stroke treatment was a pretext employed by the defendants to terminate Dr. Katz on the basis of his age, while claiming to do so for neutral reasons.

In sum, the evidence elicited in Dr. Katz's deposition that he was terminated because of age discrimination is not sufficient to justify the submission of that claim to a jury. To conclude that age discrimination was the cause of his termination based on that evidence, a jury would have to believe that Beebe was so set on getting rid of Dr. Katz because of his age (even though he was only a part-time employee with a short-term contract) that Beebe abandoned its neurohospitalist program and transitioned to the JET program simply to rid itself of him. While there was evidence that some Beebe employees (particularly Ms. Suter) expressed hostility toward Dr. Katz based at least in part on his age, the proposition that any such age-related hostility toward Dr. Katz (and/or Dr. Scheer) shows that age discrimination was the cause of Beebe's decision to dismantle the neurohospitalist program in favor of a completely different treatment model is not sufficiently supported by the evidence to survive summary judgment.

## 2. Other Evidence of Discrimination

If the evidence summarized above were the only evidence pointed to by Dr. Katz in support of his claim that he was terminated because of age discrimination, summary judgment would be appropriate on his age discrimination claim. As noted, in his response to the motion for summary judgment, Dr. Katz relies mainly on his own deposition as evidence that the defendants discriminated against him on the basis of age. *See* Dkt. No. 91 at 10–13. Dr. Katz makes reference to certain additional evidence as well, such as Dr. Scheer's affidavit, excerpts from the depositions of certain other Beebe employees, and some documents. Most of that additional evidence, however, offers little or nothing by way of support for Dr. Katz's argument that he was terminated because of his age.

But among the other items on which Dr. Katz relies is a three-page excerpt from an interrogatory response he submitted during discovery. *See* Dkt. No. 91-3, Exh. C at 11–13, cited at Dkt. No. 91 at 10. That interrogatory response described an incident in August 2020 as follows:

> Around August 2020, Plaintiff received two (2) phone calls from Defendant Robert Gulab. During one of these phone calls, Defendant Robert Gulab informed Plaintiff that he was going to lose his job and they were looking to replace Plaintiff. When Plaintiff inquired why Defendants were looking to replace him, and if he had done anything wrong, Defendant Robert Gulab informed Plaintiff that he had done nothing wrong. Defendant Robert Gulab further informed Plaintiff that Defendants were simply looking to bring in "new graduates." During one of the other phone calls, Defendant Robert Gulab called Plaintiff to ask him to cover a shift of another Doctor. During the call Defendant Gulab mentioned that this was temporary as the program doctors would be replaced by "new graduates," implying that the need for coverage due to medical ailments related to age would be eliminated when Plaintiff and Dr. Scheer were replaced by younger individuals.

Dkt. No. 91-1, Exh. C at 13. The allegations in that interrogatory response, if believed, would constitute direct evidence in support of Dr. Katz's theory that the defendants were terminating his employment so that they could replace him (and inferentially Dr. Scheer) with "new graduates," which can be understood to refer to younger physicians.

The problem with the interrogatory response is that it was not signed and sworn to by Dr. Katz, as is required by Rule 33(b)(1) of the Federal Rules of Civil Procedure. Rather than being signed and sworn to by Dr. Katz, the interrogatory responses are unsworn and signed only by Dr. Katz's attorneys. *See* Dkt. No. 91-1, Exh. C at 1, 33. As such, they are simply assertions of counsel, the contents of which are no more eligible for consideration as evidence in a summary judgment proceeding than the allegations of the complaint. *See, e.g., Adickes v. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970) ("This statement, being unsworn, does not meet the requirements of Fed. Rule Civ. Proc. 56(e) . . . ."); *Travillion v. Wetzel*, No. 24-1763, 2025 WL 971669, at *2 (3d Cir. Apr. 1, 2025) (noting "our ample caselaw holding that unsworn statements not made under penalty of perjury are not competent summary judgment evidence"); *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003); *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989).

This point was discussed in detail by the court in *In re Asbestos Products Liability Litigation. (No. VI)*, No. MDL 875, 2012 WL 5839023, at *7 (E.D. Pa. Nov. 16, 2012). Relying on prior decisions, the court held that "interrogatory responses not verified by the Plaintiff are not valid responses" and that "verification is essential for establishing the truth of the answers so that they may be relied on by the parties during the litigation and at trial." *Id.* (citations omitted). The court further explained that Rule 33 of the Federal Rules of Civil Procedure requires that the party to whom the interrogatories are directed must answer them and that the person who makes the answers must sign them under oath. *Id.* In the case of an individual plaintiff, that means that the plaintiff himself must sign the interrogatory answers. *Id.*

Numerous other cases are to the same effect, requiring an individual party to personally sign and verify his interrogatory responses under oath or other valid form of verification, in accordance with 28 U.S.C. § 1746. *See, e.g., Hindman v. Nat'l-Ben Franklin Life Ins. Corp.*, 677

F.2d 617, 619 (7th Cir. 1982) (interrogatory answers signed by attorney and not party violated "the clear mandate of Federal Rule of Civil Procedure 33(a)); *Smith v. Calypso Charter Cruises Inc.*, No. 19 Civ. 7076, 2021 WL 4084182, at *7 (S.D.N.Y. Sept. 8, 2021) (Engelmayer, J.); *DeJesus v. Malloy*, 531 F Supp. 3d 650, 663 n.11 (WD.N.Y. 2021); *United States v. $37,557.00, More or Less in U.S. Currency*, 683 F. Supp. 2d 335, 340 (D.N.J. 2010).

For the reasons stated, the plaintiff's interrogatory answers, in the form in which they were submitted, cannot be considered in assessing the plaintiff's opposition to the defendants' summary judgment motions.  But that is not the end of the story.  Rule 56(e) of the Federal Rules of Civil Procedure provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact."  The advisory committee notes commenting on that language, which was added to Rule 56 in 2010, states the following:  "Before deciding on other possible action, subdivision (e)(1) recognizes that the court may afford an opportunity to properly support or address that fact.  In many circumstances this opportunity will be the court's preferred first step."  Fed. R. Civ. P. 56, advisory committee notes, 2010 amendments.  *See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 50 (D.C. Cir. 2016); *Kam-O'Donoghue v. Tully*, No. 16-11054, 2018 WL 2739930, at *1 (D. Mass. Mar. 16, 2018); *Parks v. Blanchette*, No. 3:09-CV-604, 2015 WL 1970526, at * 1 (D. Conn. May 1, 2015); *Mulrooney v. Corp. Serv. Co.*, 2013 WL 1246769, at *16 (D. Del. Mar. 17, 2013) (Burke, J.); 11 James Wm. Moore, Moore's Federal Practice § 56.99[2][a], at 56-256–257.

In this case, I believe it is in the interest of justice to exercise my discretion in favor of allowing the plaintiff to submit a verified version of his interrogatory responses if he is prepared to swear to the truth of the representations in those responses or affirm the truth of the

representations under the penalty of perjury.  In light of that ruling, I will withhold entering summary judgment in the defendants' favor until April 15, 2025, to provide the plaintiff an opportunity to submit a proper, verified response to the defendants' interrogatories.[9]

## D.  Hostile Work Environment

Dr. Katz separately claims that because of adverse comments about his age made by fellow workers at the hospital, he was subjected to a hostile work environment[10] and is entitled to relief in the form of money damages as a result.[11]  Based on the close parallelism between the ADEA

---

[9]  There is a further wrinkle to this already complex issue.  Dr. Katz has not pointed to any evidence other than his interrogatory response that relates to the purported statements by Dr. Gulab to him in August 2020.  However, in a portion of his deposition that Dr. Katz has not cited in his response to the defendants' summary judgment motion, Dr. Katz was asked about the portion of the interrogatory response that referred to the alleged August conversation with Dr. Gulab.  *See* Dkt. No. 90-3, Exh. 10 at 200:1–15.  While I am permitted to consider that evidence, even though Dr. Katz did not cite it, *see* Fed. R. Civ. P. 56(c)(3), the problem is that in the deposition Dr. Katz did not repeat the allegations from the interrogatory response.  Instead, he simply confirmed that the interrogatory response contained those allegations, without asserting that the allegations in the interrogatory response were true.  Dkt. No. 90-3, Exh. 10 at 200:1–7.    With reference to the interrogatory responses, Dr. Katz was then asked if he told Dr. Scheer about Dr. Gulab's statements, as to which Dr. Katz simply said, "right."  *Id.* at 200:8–15. That testimony does not constitute confirmation that the conversation with Dr. Gulab took place as alleged in the interrogatory response, but only that Dr. Katz told Dr. Scheer that such a conversation occurred.  Accordingly, besides the fact that Dr. Katz did not point to that portion of his deposition in his response to the summary judgment motion, the deposition testimony does not serve as sworn testimony that the conversation related in the interrogatory response actually took place.

[10]  Several of the comments about which Dr. Katz complains relate to his alleged disability, which according to Dr. Katz was a foot injury suffered while he was running, which required him to use a cane at work from time to time.  Because his claims under the ADA were dismissed at the outset of the case, the comments about his alleged disability are not actionable and do not bear on his hostile work environment claim.

[11]  With regard to Dr. Katz's claim for monetary damages, it is well established that the ADEA does not allow compensatory damages for pain and suffering.  *See Comm'r of Internal Revenue v. Schleier*, 515 U.S. 323, 326 (1995); *Rogers v. Exxon Res. & Eng'g Co.*, 550 F.2d 834, 841–42 (3d Cir. 1977).  The remedy provisions of the ADEA allow awards for "only those pecuniary benefits connected to the job relation," including unpaid wages or overtime compensation.  *See Collazo*, 535 F.3d at 44–45.  The ADEA permits the award of liquidated damages in the amount of double the basic damages award for lost wages and other compensation for willful violations of the statute, *see Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 372 (3d Cir. 2004), but it has been held not to otherwise allow punitive damages.

and Title VII of the Civil Rights Act of 1964, a number of circuits have held that a hostile work environment claim can be raised in an ADEA action.  *See Collazo v. Nicholson*, 535 F.3d 41, 44–45 (1st Cir. 2008); *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999); *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834–35 (6th Cir. 1996); *Sischo-Nownejad v. Merced Comty. College Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991).

The Third Circuit, however, has never answered the question whether a hostile environment claim can be raised in an ADEA action; instead, it has repeatedly assumed that such an action would lie under the ADEA but has declined to so hold definitively, as the court has ruled against the plaintiff on the merits of the hostile work environment claim in each such case.  *See Howell v. Millersville Univ. of Pa.*, 749 F. App'x 130, 135 (3d Cir. 2018); *Culler v. Sec'y of U.S. Veterans Affairs*, 507 F. App'x 246, 249 n.3 (3d Cir. 2012); *Slater v. Susquehanna Cty.*, 465 F. App'x 132, 138 (3d Cir. 2012); *Lyles v. Phila. Gas Works*, 151 F. App' x 169, 171 n.3 (3d Cir. 2005).  For purposes of this case, I will follow the Third Circuit's lead and assume, without deciding, that a hostile work environment claim states a claim under the ADEA.  *See James v. A.C. Moore Arts & Crafts, Inc.*, No. 18-63, 2021 WL 1226421, at *5 (D. Del. Mar. 31, 2021).

To prove a hostile work environment claim under Title VII (and therefore by extension under the ADEA), a plaintiff must establish that: (1) the employee suffered intentional discrimination; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there was *respondeat superior* liability for the conduct.  *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023).

In evaluating any hostile environment claim, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel v. M & Q Packaging Co.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  The Third Circuit has emphasized that "[w]e 'concentrate not on individual incidents, but on the overall scenario' when analyzing a hostile work environment claim."  *Qin v. Vertex, Inc.*, 100 F.4th 458, 471 (3d Cir. 2024) (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262–63 (3d Cir. 2005)).

When examining the "overall scenario," a court must be mindful that the standard for establishing a hostile workplace environment claim is high.  Title VII (and by extension the ADEA) does not create "a general civility code for the American workplace."  *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998).  Rather, the plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).  "The conduct must be extreme to amount to a change in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Events such as "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.*

Principally through his own deposition testimony, Dr. Katz has identified a series of comments made by co-workers during the course of his employment that referred disparagingly to Dr. Katz's age.  Some of those alleged comments were made directly to Dr. Katz; others were made to Dr. Scheer; and others were overheard by Dr. Katz.  The bulk of those comments were

attributed to Ms. Suter.  Each of the persons Dr. Katz accused of making discriminatory remarks about Dr. Katz's age denied having done so, and there is no corroborating evidence for most of the comments testified to by Dr. Katz.  Nonetheless, for purposes of summary judgment, I take Dr. Katz's evidence as true and view it in the light most favorable to him.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The comments at issue are the following:

1.  Dr. Katz testified that during his onboarding process, he heard Dr. Gulab make a statement to an assistant about the hospital needing "new graduates" and being unable to build a program "with doctors at the end of their career who are older."  Dkt. No. 90-3, Exh. 10 at 179:5–180:17.  Dr. Katz added that Dr. Gulab pointed to Dr. Katz when he made that statement.  *Id.* at 180:16–17.  At his deposition, Dr. Gulab testified that he never interacted with Dr Katz in person and that he did not know Dr. Katz's age.  Dkt. No. 90-2, Exh. 4 at 63:4–15, 64:2–16.  In his affidavit, Dr. Scheer reported that after Dr. Katz was hired, Dr. Gulab told Dr. Scheer that if he recruited any more doctors, he should "make sure they are not disabled and 'new graduates.'"  Dkt. No. 91-4, Exh. D at ¶ 27.  The evidence does not show whether Dr. Scheer passed that that comment on to Dr. Katz.  Dr. Scheer also averred, more generally, that he "repeatedly reported Dr. Katz' concerns of age and disability discrimination to my supervisor, Dr. Gulab," who "assured me he would "conduct a full investigation," but that Dr. Scheer "was never contacted or interviewed about any claims whatsoever about age and/or disability discrimination regarding me or Dr. Katz."  *Id.* at ¶ 30.

2.  Dr. Katz also testified that during his onboarding, he put his injured foot on a table because his foot was swollen as the result of a running injury.  When he did so, Mr.

Schaffner allegedly commented to Dr. Scheer: "how did you hire someone who's old and disabled who can't do their job?" Dkt. No. 90-3, Exh. 10 at 176:3–18. Dr. Katz did not hear that comment directly, but it was relayed to him by Dr. Scheer. *Id.* at 176:22–177:7. In his affidavit, Dr. Scheer repeated that account, stating that Mr. Schaffner and Dr. Peete, who was the President of the Medical Staff, complained about Dr. Katz's age and "asked me how I could hire someone so old and disabled." Dkt. No. 91-4, Exh. D at ¶ 27. Mr. Schaffner testified that he never met Dr. Katz and never made such a comment. Dkt. No. 90-4, Exh. 12 at 40:1–4. Dr. Peete was not deposed.

3. Dr. Katz testified that during the second week of May 2020, he encountered Ms. Suter in the Emergency Room while he was using a cane and having trouble walking. According to Dr. Katz, Ms. Suter said "out of the blue" that he was "old and disabled." Dkt. No. 90-3, Ex. 10 at 150:15–18, 151:24–152:24, 153:25–154:19.

4. A couple of days later, according to Dr. Katz, he went to Ms. Suter's office with Dr. Scheer. On that occasion, Dr. Katz testified, Ms. Suter referred to them both as "lame neurologists," and stated that Beebe needed to hire "new graduates." Dkt. No. 90-3, Exh. 10 at 148:25–149:4, 156:20–157:22. Dr. Katz also testified that Ms. Suter accused them both of not "understand[ing] how to use technology," stating that she could not "believe these are the people we hire." *Id.* at 149:5–7. In her deposition, Ms. Suter denied that she ever met Dr. Katz or interacted with him except on the telephone. Dkt. No. 90-4, Exh.14 at 58:7–59:177:8–12, 80:10–20.

5. In late May, Dr. Katz testified, he encountered Ms. Suter in the hallway. In response to his greeting, Ms. Suter called him "old, infirm, lame and impaired," and asked him when he planned to retire. *Id.* at 164:5–165:15, 168:6–14.

6.  In June 2020, Dr. Katz testified, he had a similar interaction with Ms. Suter.  On that

occasion, he said, she appeared "angry at the world" and cursed at him when he greeted

her.  *Id.* at 167:9–168:24.  Dr. Katz did not testify about the specific language she used

other than to describe them as "a litany of obscenities."  *See id*.

7.  In August, according to Dr. Katz, Ms. Suter made a comment to Dr. Katz having

"something to do with Alzheimer's or being forgetful," but Dr. Katz was unable to

recall the specific comment.  *Id.* at 169:13–22.

8.  On another occasion, Dr. Katz testified that he overheard an unidentified person

speaking with Ms. Suter in the Emergency Room and referring to Dr. Katz as old and

lame.  *Id.* at 194:24–195:14.

9.  Dr. Katz testified about two encounters with Dr. Hawtof.  In March 2020, at the outset

of the COVID-19 pandemic, Dr. Katz testified that he was getting dressed in COVID

protective gear in preparation for going into a patient's room when Dr. Hawtof yelled

at him.  According to Dr. Katz, Dr. Hawtof was "appalled" that Dr. Katz felt it

necessary to use protective gear when examining patients.  When Dr. Katz asked,

"What am I going to do?" Dr. Hawtof reportedly responded, "I can't believe we have

old and infirmed people.  How did we hire people like you?"  Dkt. No. 90-3, Exh. 10

at 172:8–13.

10. Two months later, Dr. Hawtof saw Dr. Katz wearing a mask and told Dr. Katz it was

unnecessary to do so.  Dr. Katz replied, "Of course you have to wear it," to which Dr.

Hawtof allegedly responded, "Only you—only old and disabled people like you need

to take those kind of precautions."  *Id.* at 173:1–174:7.

11. Finally, Dr. Katz testified that a woman who was working in Dr. Gulab's office told Dr. Katz that Beebe was looking for "young blood" neurologists who knew how to use computers. *Id.* at 196:2-197:10, 198:3-199:7.

Those comments, taken as a whole, are insufficient to allow a reasonable jury to find that Dr. Katz's workplace was "permeated with discriminatory intimidation, ridicule, and insult," sufficient to create an "abusive working environment." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 116. The most derogatory age-related language that Dr. Katz could specifically recall was being told that he was "old." Comments about the need for "new graduates" or "young blood" implied that Dr. Katz was neither of those things, but they were no more offensive than telling him that he was "old." Moreover, the comments at issue were not always made directly to Dr. Katz—in three of the instances, Dr. Katz either overheard the comment being made to someone else or it was reported to him by Dr. Scheer, lessening their impact.

Dr. Katz argues that the comments were severe because they "included a veiled threat and a direct threat to [his] employment and were made by individuals in supervisory positions, one of whom carried out the threat when he issued [Dr. Katz's] termination letter." Dkt. No. 91 at 16. In making that argument (without citations to the record for support), Dr. Katz implies that all the individuals who made the comments at issue were his supervisors, authorized to take tangible employment actions against him. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) ("We hold that an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment action against the victim . . . ."). But the summary judgment record shows that the only individual who made a comment about Dr. Katz's age and who was authorized to take tangible employment actions against Dr. Katz was Dr. Gulab.

There is no evidence that the woman in Dr. Gulab's office who made the comment that the hospital was looking for "young blood" neurologists was a supervisor of Dr. Katz. There is also no evidence that the unidentified person who referred to Dr. Katz as "old" while speaking to Ms. Suter was his supervisor. As for the supervisory status of Ms. Suter, Mr. Schaffner, and Dr. Hawtof, Dr. Scheer stated in his affidavit that "upon information and belief," each of those individuals "was empowered with the authority to take a tangible employment action against Dr. Katz." Dkt. No. 91-4, Exh. D at ¶¶ 15, 17, 20. Those paragraphs, however, do not satisfy the requirements of Rule 56(c)(4) of the Federal Rules of Civil Procedure and thus cannot be considered as evidence for purposes of summary judgment.

First, an affidavit that is "essentially conclusory and lacking in specific facts" does not satisfy a party's burden under Rule 56. *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985) (cleaned up); *see also Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144 (3d Cir. 1990) (holding that the district court did not err in disregarding an affidavit that asserted that no professional judgment was exercised, without explaining "why this is so, or what alternative professional judgment would indicate"); *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972) ("Conclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment."). Those paragraphs in Dr. Scheer's affidavit make only the conclusory statement that Ms. Suter, Mr. Schaffner, and Dr. Hawtof were each "empowered with the authority to take a tangible employment action against Dr. Katz," without providing any specific facts about the actions they were authorized to take and the basis for their authority. Indeed, Dr. Scheer's conclusory statement simply repeats exactly the same verbal formula that the Supreme Court has used to define a "supervisor" in the context of a hostile work environment claim. *See Vance*, 570 U.S. at 424.

*Ke v. J R Sushi 2 Inc.*, No. 19-CV-7332, 2022 WL 1496576 (S.D.N.Y. Feb. 7, 2022), recommendation adopted, 2022 WL 912231 (S.D.N.Y. Mar. 28, 2022), is a case very similar to this one with respect to the use of conclusory interrogatory answers to oppose summary judgment. The plaintiff in that Fair Labor Standards Act case relied on an interrogatory response in which she asserted that one of the individual defendants "had the power to hire and fire employees of, supervised and controlled employee work schedules and conditions of employment at, determined employee rates and methods of payment at, and kept and maintained employee records for" the defendant. *Id*. at *9 n.8. The court characterized that answer as "worthless boilerplate," not constituting "specific, admissible evidence" that the individual defendant "supervised" the plaintiff or "controlled" her work schedule or conditions of employment. *Id*. at *9–10. The language from Dr. Scheer's affidavit is, if anything, even more conclusory than the language at issue in the *Ke* case.

A second reason why those paragraphs in Dr. Scheer's affidavit fail to satisfy Rule 56 is that they are expressly and solely based "on information and belief." It is well settled that, absent unusual circumstances, an affidavit based on information and belief does not comply with Rule 56(d). *See Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 831 (1950); *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015); *Schell v. Bluebird Media,* LLC, 787 F.3d 1179, 1188 (8th Cir. 2015); *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004); *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002); *Richardson v. Oldham*, 12 F.3d 1373, 1378 (5th Cir. 1994); 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 at 326-34 (2016) ("Thus, ultimate or conclusory facts and conclusions of law, as well as statements made on belief or 'on information and belief,' cannot be utilized on a summary-judgment motion.").

Without Dr. Scheer's affidavit, there is no evidence in the record to support that Ms. Suter, Mr. Schaffner, and Dr. Hawtof were Dr. Katz's supervisors who could take tangible employment actions against him.[12] That leaves only Dr. Gulab as someone who was Dr. Katz's supervisor and made a discriminatory remark to him. The comment attributed to Dr. Gulab, however, is his statement to an assistant that the hospital needed "new graduates" and could not build a program "with doctors at the end of their career who are older." Dkt. No. 90-3, Exh. 10 at 179:5–180:17. The nature of that comment, even when coupled with the fact that Dr. Gulab was authorized to take tangible employment actions against Dr. Katz, is insufficient for a reasonable jury to find severe workplace discrimination.

Although Dr. Katz disputes the defendants' assertion that there are only ten instances of allegedly discriminatory comments in the record, he does not identify how many more instances there were or what was specifically said in those additional instances, such that they could support a finding of pervasiveness. *See* Dkt. No. 91 at 15–16. Instead, Dr. Katz makes the general assertion in his brief that various discriminatory comments were made "often," "on numerous occasions," and on "several occasions." *Id*. at 15. Dr. Katz also cites Dr. Scheer's affidavit as support for his contention that age discrimination was "rampant at Beebe Hospital." *Id*. at 16 (citing Dkt. No. 91-4, Exh. D at ¶ 28). That statement, however, like other statements in Dr. Scheer's affidavit, is "essentially conclusory and lacking in specific facts," and therefore cannot

---

[12] Although Dr. Katz testified that Ms. Suter told him she was his "boss," Dkt. No. 90-3, Exh. 10 at 148:18–25, 149:16–22, 152:1–8, 154:6–10, he also testified that when he sought to report her conduct to the Beebe Healthcare HR department, he was informed that "you work for Beebe Medical Group. So Dr. Gulab is your boss." *Id*. at 159:8-9. The summary judgment record shows that although Ms. Suter had administrative responsibility for the stroke program, she was not responsible for hiring the neurohospitalists, for setting their work schedules, or for supervising their work, or for disciplining them. Dkt. No. 90-4, Exh. 14 at 28:20–23, 87:23–88:2; Dkt. No. 90-6, Exh. 16 at 65:8–10, 66:15–18. She was employed by Beebe Healthcare as a non-physician and was not in the same chain of command as Dr. Katz.

be considered as substantive support for Dr. Katz's opposition to the defendants' motion for summary judgment.[13]  *Maldonado*, 757 F.2d at 51.

Considered in the aggregate, the 11 incidents of which Dr. Katz complains, which occurred over a six-month period, do not allow a reasonable jury to find age discrimination that was sufficiently severe or pervasive to have altered the conditions of Dr. Katz's employment. Summary judgment is therefore granted to the defendants with respect to Dr. Katz's claim that he was subjected to a hostile work environment.

### E.  Retaliation for Complaints about Age Discrimination

Dr. Katz also contends that his termination was in retaliation for the complaints that he made about age discrimination directed at him.  This is the weakest of Dr. Katz's claims, as it has essentially no support in the evidence on which he relies.

The *McDonnell Douglas* framework applies not only when a plaintiff complains that an employer has taken an adverse action based on discrimination, but also when a plaintiff claims he has been subjected to retaliation under the ADEA.  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).  A plaintiff must first establish a *prima facie* case by showing (1) that he engaged in a protected activity, such as complaining about discriminatory conduct, (2) that he was thereafter (or contemporaneously) subjected to an adverse action, and (3) that the adverse action was causally related to the protected activity.  *Id*.  To make out a *prima facie* case of retaliation, the plaintiff must produce "evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse employment action," which is a lesser burden than the

---

[13]  Dr. Scheer's affidavit contains some factual allegations about comments that were made to him concerning his own age or the age of employees other than Dr. Katz.  Dr. Katz, however, makes no argument in reliance on those incidents.  Moreover, there is no suggestion in Dr. Scheer's affidavit that he shared any of those comments with Dr. Katz, so there is no basis for concluding that those comments contributed to Dr. Katz's perception that the Beebe hospital was a hostile work environment.

plaintiff's ultimate burden of establishing but-for causation between the adverse employment action and retaliatory animus. *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 258 (3d Cir. 2017) (cleaned up) (Title VII retaliation case).

If the plaintiff makes a *prima facie* showing of retaliation, "the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action." *Daniels*, 776 F.3d at 193. "If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason was false, and that retaliation was the real reason for the adverse employment action." *Id.* (cleaned up).

The evidence offered by Dr. Katz regarding his complaints about age discrimination in the workplace is as follows: In his deposition, Dr. Katz testified that in the aftermath of his initial confrontation with Ms. Suter, he reported the incident to Dr. Scheer and asked Dr. Scheer if he was going to take any action about Ms. Suter's comments. Dr. Scheer told him, "You need to report this to personnel." Dkt. No. 90-3, Exh. 10 at 158:14–25. Dr. Katz then went to the Beebe Healthcare personnel office, where he was told that because he worked for the Beebe Medical Group and Dr. Gulab was his boss, he needed to report any problems to Dr. Gulab. *Id.* at 159:3–160:3. Dr. Katz testified that he then spoke to Dr. Gulab about the incident by telephone, and Dr. Gulab said that because Dr. Scheer was immediate Dr. Katz's supervisor, Dr. Katz should report the matter to Dr. Scheer. *Id.* at 160:6–162:5. When Dr. Katz reported that conversation to Dr. Scheer, Dr. Scheer "threw up his hands" and said, "This is how this place works." *Id.* at 162:3–9. After that conversation, Dr. Katz did not take the matter any farther. *Id.* at 162:10–16.

Dr. Katz testified that after the next confrontation with Ms. Suter in May, he reported the incident to Dr. Scheer, and Dr. Scheer said he was going to have to report it to Dr. Gulab. *Id.* at

166:10–22.  Dr. Katz did not recall Dr. Scheer later saying anything about having gone to Dr. Gulab with the matter.  *Id.* at 166:23–167:8.

Dr. Katz also testified that he told Dr. Scheer about the confrontation with Ms. Suter in June and August.  *Id*. at 168:15–170:10.  Following each such incident, according to Dr. Katz, Dr. Scheer said he was going to report it to Dr. Gulab.  *Id*.  However, Dr. Katz did not know whether Dr. Scheer did so or not.  *Id.*  Dr. Gulab testified that Dr. Scheer never raised a complaint about discrimination other than his own complaint that his termination was the product of discrimination against him.  Dkt. No. 90-5, Exh. 15 at 74:2–74:3.

Dr. Katz testified that he also told Dr. Scheer about the two comments made by Dr. Hawtof. According to Dr. Katz, Dr. Scheer replied that Dr. Hawtof was "in administration in the hospital," and that "[t]hat's going to be a problem for you . . . Just stay away from him."  *Id.* at 175:4–16.

In his affidavit, Dr. Scheer stated that as Dr. Katz's supervisor, he "repeatedly reported Dr. Katz' concerns of age and disability discrimination" to Dr. Gulab, who assured him he would conduct a full investigation.  However, Dr. Scheer added that he was never contacted or interviewed about any claims of discrimination, and that to his knowledge his reports of discrimination "were never investigated and/or addressed."  Dkt. No. 91-4, Exh. D at ¶¶ 30, 33.

The retaliation evidence offered by Dr. Katz is sufficient to raise a factual question as to whether Dr. Katz engaged in a protected activity, namely, reporting perceived discriminatory conduct in the workplace.  The evidence is also sufficient to raise a factual question as to whether Dr. Katz was subjected to an adverse action, namely, the termination of his contract as a neurohospitalist.  *See Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320–21 (3d Cir. 2008).  But the evidence is not sufficient to raise the inference that Dr. Katz's complaints about discrimination were the likely reason for his termination.

First of all, there was no suggestive temporal proximity between his complaints and the decision to terminate him.  The limited conversation that Dr. Katz had with Dr. Gulab about Ms. Suter occurred several months before his termination.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").  And Dr. Scheer's assertions that he "repeatedly" reported Dr. Katz's concerns about age and disability discrimination to Dr. Gulab, and that he reported "multiple violations of Beebe's Code of Conduct numerous times," Dkt. No. 91-4, Exh. D at ¶¶ 30, 32, are vague.  Dr. Scheer's statements do not provide any detail about when he made those reports, which incidents he reported, or what reaction he received from Dr. Gulab or others regarding those reports, such that they could raise an inference of causation.

In his brief, Dr. Katz focuses instead on a conflict that arose between him and Dr. Gulab *after* he was terminated, in which Dr. Gulab insisted that Dr. Scheer stop seeing patients and leave the hospital.  *See* Dkt. No. 91 at 18–19.  While that evidence may well indicate that the two were in a hostile relationship by that time, there is no evidence, nor any basis for inferring, that the hostile relationship was attributable to the occasion on which Dr. Katz complained to Dr. Gulab about Ms. Suter, or any complaints that Dr. Scheer may have raised with Dr Gulab on Dr. Katz's behalf.  There were clearly bad feelings surrounding the termination of Dr. Katz and Dr. Scheer, but it would be entirely speculative to attribute those bad feelings, or the decision to terminate Dr. Katz, to the fact that Dr. Katz had, much earlier, complained about discriminatory remarks made by Ms. Suter.  Moreover, even assuming that there was sufficient evidence to make out a *prima facie* case of retaliation, there is insufficient evidence, as discussed above, for a reasonable jury to

find that the legitimate reason that the defendants have offered for Dr. Katz's termination was pretextual. Summary judgment is therefore granted to the defendants on the retaliation issue.

## III.    CONCLUSION

For the reasons stated above, summary judgment is granted to the individual defendants on the ground that they do not qualify as "employers" under the ADEA and the DDEA. Summary judgment is also granted to Beebe Healthcare and Beebe Medical Group on the plaintiff's claims that the defendants subjected him to a hostile work environment and retaliated against him for engaging in protected activity. At this time, I will not enter summary judgment in favor of the defendants Beebe Healthcare and Beebe Medical Group on the plaintiff's claim that he was terminated because of age discrimination, pending the plaintiff's submission of a signed and verified version of the interrogatory responses that were submitted by his attorneys on his behalf. Any such submission will be required to be filed by April 21, 2025.

IT IS SO ORDERED.

SIGNED this 11th day of April, 2025.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE